379 So.2d 822 (1980)
Edward C. RAGAS
v.
ARGONAUT SOUTHWEST INSURANCE COMPANY et al.
No. 10584.
Court of Appeal of Louisiana, Fourth Circuit.
January 10, 1980.
Rehearing Denied February 20, 1980.
*823 Jerald N. Andry and Gilbert V. Andry, III, Edwin R. Fleischmann, Jr., New Orleans, for plaintiff-appellant.
McGlinchey, Stafford, Mintz & Hoffman, Lawrence J. Centola, Jr., New Orleans, for defendants-appellees.
Before SAMUEL, LEMMON and GULOTTA, JJ.
GULOTTA, Judge.
Plaintiff appeals from a directed verdict dismissing his medical malpractice claims. We affirm.
On June 19, 1975 Edward C. Ragas underwent surgery at Algiers General Hospital to excise infected lymph nodes in his right groin and right armpit. In his suit directed against the surgeon, plaintiff alleged that because of the doctor's negligence during surgery he had sustained injury to the median and ulnar nerves of his right arm. In that part of the suit directed against the anesthetist, the recovery-room nurse and the hospital, Ragas alleged that his left eye had been injured when a foreign substance was dropped into it by the anesthetist immediately before or during surgery. At the conclusion of a jury trial, the judge granted a directed verdict in favor of all defendants, and dismissed plaintiff's suit.
The directed verdict is a new procedural mechanism in civil cases in Louisiana, added to the Code of Civil Procedure in 1977 by Article 1810. The statute does not establish the standards to be applied by the court in ruling on a motion for directed verdict. Furthermore, because of the relatively recent passage of the Act providing for the new procedural device, our Louisiana courts have had little opportunity to speak out. However, the language of the Louisiana Statute is taken verbatim from Federal Rule of Civil Procedure 50(a). It is appropriate, therefore, that we look to the federal jurisprudence for guidance. The U.S. Fifth Circuit Court of Appeals in Boeing Company v. Shipman, 411 F.2d 365 (5th Cir. 1969) stated:
"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in *824 favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury." 411 F.2d at 374.
See also, Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir. 1979).
Applying that well-recognized standard to our case, we find a directed verdict was proper in favor of the anesthetist, the nurse, and the hospital. Plaintiff produced no proof of any causal connection between his alleged eye injury and these defendants' actions. The only testimony regarding the eye injury came from plaintiff and his wife. Plaintiff testified the anesthetist had dropped some liquid in his eye right before he lost consciousness from the anesthetic. He and his wife both said that his eye began bothering him when he returned to his hospital room from the recovery room after surgery. Both of them admitted, however, that plaintiff himself rubbed his eye for several minutes, and then had his wife blow in his eye for several minutes, before complaining to a nurse. Plaintiff subsequently was seen by an eye specialist at the hospital, but this doctor was not called to testify. Only the hospital record of the eye specialist's examination was entered into evidence. In that record plaintiff's complaint was diagnosed as "possible corneal abrasion." Under these circumstances, we conclude that the evidence offered was woefully insufficient to connect plaintiff's eye complaint to defendants. We therefore find no error in the granting of a directed verdict in favor of these defendants.
We find the trial judge erred, however, in granting a directed verdict in favor of Dr. Overby. Considering the evidence and all reasonable inferences most favorable to plaintiff, we believe there was sufficient evidence to have placed the question before the jury.
Under our Constitutional mandate to review both law and fact, and because the entire record is before us, a remand in this case would serve no useful purpose. See Gonzales v. Xerox Corp., 320 So.2d 163 (La. 1975).
Based on our consideration of the record, however, we conclude that Ragas has failed to establish liability against Dr. Overby. Our conclusion is based primarily on the testimony of the expert medical witnesses who generally testified that it was highly unlikely and improbable that the restricted movement of plaintiff's hand was causally related to the surgery.
Dr. John Overby testified that if the ulnar and median nerves were cut in the armpit plaintiff would have had a totally useless hand and arm immediately after surgery. Although plaintiff claims Dr. Overby's testimony was self-serving and contradictory, in fact the substance of the doctor's testimony regarding the effect of cutting the median and ulnar nerves was well-supported by testimony from other physicians.
Dr. Evan Howell, plaintiff's own witness, said it is highly unlikely and improbable that there could be a lesion or cut in the median and/or ulnar nerve in the axillary area of the armpit such as to cause only a partial loss or diminished use of the hand as opposed to a full loss of use. Based on his physical findings and tests, Dr. Howell thought it more probable that plaintiff's injury was due to a previous injury to the right hand or thumb.
Dr. Theodore Soniat, a neurologist, testified that if the median nerve were damaged severely the muscle at the base of the thumb would atrophy and the patient would have trouble with gripping. According to this expert, if the ulnar nerve were severely damaged, the patient could have atrophy of the muscle between the bones at the back of the hands, including the muscle between the thumb and index finger. Dr. Soniat said there could be a partial loss of function *825 if just a small part of the nerve cable were cut; however, it would be difficult to cut these nerves in the armpit.
An orthopedic surgeon Dr. Russell Grunsten, stated that the limitation of motion in plaintiff's hand indicated damage to the ulnar and median nerves in the palm of the hand rather than in the armpit. He did not believe the two nerves could be damaged in the armpit without cutting one or both major blood vessels in this area, which would cause major hemorrhage. Further, such injury would cause additional paralysis in the arm. He felt the only logical explanation for plaintiff's injury would be damage to these two nerves in the palm of the hand.
Dr. Raymond Horn, who had performed knee surgery on the plaintiff in early June 1975, stated that plaintiff had lost use of the muscles between the thumb and forefinger of the right hand. If the ulnar nerve had been damaged at the armpit, he said, plaintiff would have lost some flexion in the fourth and fifth fingers, all sensation in the fifth, half the sensation in the fourth, and all abduction and adduction of the fingers. (Plaintiff's only loss, however, was the ability to oppose the thumb and forefinger.) Dr. Horn considered it unlikely the ulnar and median nerves to be damaged in the armpit without also damaging the artery.
Dr. Frank Wagner, plaintiff's family physician, testified that he examined plaintiff a few weeks after the surgery, but plaintiff made no complaints about difficulty with his right arm. His notes did not indicate plaintiff complained about numbness, paralysis, or inability to use the arm. Furthermore, he did not have any independent recollection of complaints of numbness and paralysis. The doctor indicated that he would have noticed had there been substantial abnormal motion of plaintiff's right arm during his examination.
According to Dr. Howard Nelson, a general surgeon, before striking the median and ulnar nerves during surgery, the surgeon would have to cut through the axillary vein and axillary artery. If this happened, a patient could bleed to death in one or two minutes; there would be blood all over the floor and every place else in the operating room. Moreover, if the ulnar and/or median nerves were cut or struck in this area, the patient would have an immediate and dramatic loss of function and/or sensation in the hand and forearm. If both these major nerves were cut, there would be total and complete loss of motor power and sensation, the patient would be unable to move his fingers or to open and close his hand; and he would have no feeling at all on either side of his hand. Dr. Nelson could not conceive that it would be possible to sever only a portion of the nerves, so as to have only some localized symptoms in the hand. He further testified that if a patient were found by electro-diagnostic studies to have loss of function of his thumb, and that were the limit of his injury, the probable cause of injury would be somewhere in the forearm or wrist, on the recurrent motor branch of the median nerve.
We attach great weight, also, to plaintiff's lack of credibility. His testimony was impeached on numerous occasions. He denied having made certain statements to doctors who examined him, which the doctors testified he made. He denied he had problems with his arm and hand prior to the operation, although Navy medical records showed that he had lost the ability to oppose his thumb and fingers in the right hand. The doctors who examined plaintiff's Navy medical record attributed his inability to oppose his thumb and to move certain muscles on the right hand to an accident he allegedly suffered while in the Navy in 1955. Furthermore, despite plaintiff's complaints of injury to his eye, it is clear that he never received any treatment for the eye after the episode in the hospital, although he said he complained to every doctor he saw about the eye. None of the doctors, on the other hand, remembered him saying anything about it, and none of them had any record of treating him for an eye complaint.
In summary, neither plaintiff's testimony as a whole, nor the objective conclusion of the medical evidence, supports the malpractice claim against Dr. Overby.
*826 Having so concluded, we affirm the judgment of the trial court.
AFFIRMED.
LEMMON, Judge, concurs and assigns reasons.
The purpose of the motion for directed verdict is to take away from the jury a case in which the evidence is insufficient to create an issue of fact and in which any decision other than the directed verdict would therefore be erroneous as a matter of law. In considering a motion for directed verdict, the trial judge does not weigh evidence or evaluate credibility, but rather views the evidence in the light most favorable to the party against whom the motion is made and determines whether that party nevertheless loses the case as a matter of law.
Thus, when the trial judge has granted a directed verdict, the jury has not performed its fact-finding function because the trial judge has determined that there are no factual issues for jury resolution. And when there is an appeal from a directed verdict, the first issue for the appellate court is the correctness of that determination by the trial judge.
If the appellate court determines that there were factual issues which should have been presented to the jury, then the directed verdict must be set aside. In other jurisdictions the matter is then remanded for retrial. However, a Louisiana appellate court, which has the constitutional power to review both the facts and the law, has the power, after setting aside a directed verdict, to render a decision based on the record (if complete).
Therefore, while one cannot question the power of a Louisiana appellate court to find facts and to render decisions based on the record after a judgment granting a directed verdict has been set aside, one can question the wisdom of exercising this power in all cases. Such action has been justified only on the basis of judicial economy. See Gonzales v. Xerox Corp., above.
It appears inconsistent for an appellate court to determine that the record presents a question for jury resolution which should not be decided by the trial judge (who heard the evidence) and then to proceed to resolve the question by weighing evidence and making credibility determinations based on the reading of a cold record. Perhaps more importantly, such action by an appellate court is a distortion of the proper allocation of functions between the trial and appellate courts. See Canter v. Koehring Co., 283 So.2d 716 (La.1973).
Louisiana procedural concepts generally guarantee a litigant one trial and one appeal. In the present case, however, neither the trial judge nor the jury has performed the fact-finding function allocated to that tier of the judicial system. The result of the procedure employed here is that one court performs both the trial function of finding facts and the appellate function of determining whether the evidence supports the factual findings requisite for the judgment.