423 So.2d 1213 (1982)
METROPOLITAN NEW ORLEANS CHAPTER OF the LOUISIANA CONSUMER'S LEAGUE, INC., Nancy Peters, wife of/and Stephen I. Dwyer, Kathy Sherman, Wife of/and Richard R. Sims, and all others similarly situated
v.
The COUNCIL OF the CITY OF NEW ORLEANS and New Orleans Public Service, Inc.
No. 11607.
Court of Appeal of Louisiana, Fourth Circuit.
November 4, 1982.
Rehearing Denied January 14, 1983.
Stephen M. Irving, Baton Rouge, and John Robbert, New Orleans, for plaintiffs-appellants.
Salvador Anzelmo, City Atty., Jacob Taranto, III, Deputy City Atty., Chaffe, McCall, Phillips, Toler & Sarpy, Harry McCall, Jr., Norris S.L. Williams and James P. Farwell, New Orleans, for defendants-appellees.
Before SAMUEL, SCHOTT and GARRISON, JJ.
GARRISON, Judge.
This is an appeal from a judgment of the district court dismissing plaintiff's class action suit to recover 26.2 million dollars in *1214 allegedly improper Fuel Adjustment Charges (hereinafter FAC). The trial court dismissed the case on a directed verdict in favor of the defendants, the City Council of the City of New Orleans (hereinafter City Council) and New Orleans Public Service, Inc. (hereinafter NOPSI).
The Metropolitan New Orleans Chapter of the Louisiana Consumers' League, Inc. (hereinafter Metro) filed suit seeking an injunction mandating the City Council to hold monthly public hearings prior to allowing NOPSI to assess a fuel adjustment charge and seeking a 26.2 million dollar refund of all fuel adjustment charges assessed from January 1, 1973 to the present.
On appeal plaintiffs-appellants allege that the trial court erred by applying an incorrect standard for a directed verdict and that the trial court erred in granting a directed verdict in light of the evidence presented.
C.C.P. Article 1810 provides as follows:
"A. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury. "B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence."
We note that the trial judge has much discretion in determining whether or not a motion for directed verdict should be granted. Broussard v. Missouri Pac. R. Co., 376 So.2d 532, 536 (La.App.3rd Cir.1979).
In Sevin v. Shape Spa for Health & Beauty, Inc., 384 So.2d 1011 (La.App. 4th Cir. 1980) this court further discussed C.C.P. Art. 1810(B) as follows:
"Before reviewing plaintiff's evidence we must determine what weight or standard the trial judge sitting without a jury should accord plaintiff's evidence under Art. 1810(B). Able counsel for plaintiff strongly advocates that evidence should be weighed in the light most favorable to plaintiff's case. The alternative is for the trial judge to evaluate plaintiff's case in chief based on a preponderance of the evidence.
"We are satisfied that this question is res nova. LSA-C.C.P. Art. 1810 is of very recent vintage (1977). The first paragraph (A) provides for a directed verdict in the District Court sitting with a jury; and paragraph (B) allows a directed verdict by the trial judge sitting without a jury.
"Unfortunately, Art. 1810 does not establish any standard for the trial court to use in weighing evidence on a defendant's motion for dismissal.
"Plaintiff urges the holding in Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir.1979) which said that all of the evidence should be viewed in the light most favorable to the party opposing the motion; if there is evidence of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions, a motion for directed verdict should be denied. Campbell, 373 So.2d at 239. However, that case does not apply here since the decision involved a jury trial and application of paragraph (A) under Art. 1810. The Third Circuit in Campbell adopted the philosophy of our federal courts in interpreting Art. 1810(A) by looking to the parallel provisions *1215 of F.R.C.P. Rule 50(a). Both this court and the First Circuit have followed that same reasoning in jury cases on directed verdicts. See: Ragas v. Argonaut Southwest Ins. Co., 379 So.2d 822 (La. App. 4th Cir., 1980); Perkins v. American Machine & Foundry Co., 385 So.2d 492 (La.App. 1st Cir.1980). Application of this federal counterpart was made in Boeing Company v. Shipman, 411 F.2d 365 (5th Cir.1969) which said that the trial judge, when considering a motion for directed jury verdict, may grant the motion only when `facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict ....' 411 F.2d at 374. "Plaintiff, in argument and brief, refers to a number of decisions in other states which support the general proposition that the trial court must consider plaintiff's evidence in a light most favorable to the party against whom the motion is directed. However, all were jury cases applicable to the standard of paragraph (A) of Art. 1810. Is the severe restriction on the trial judge under (A) applicable here when we are not concerned with plaintiff's right to a jury determination of the facts?
"Article 1810(B) basically tracts the language in the second sentence of F.R.C.P. Rule 41(b). We have no doubt this procedural innovation found its way into our state statutes via the conceptual origin in the federal system. One solution would be to utilize the logic in Madison v. Traveler's Insurance Company, 308 So.2d 784 (La.1975) which held that when state rules of procedure are obtained from federal rules the state courts may look for guidance to federal decisions which have interpreted identical provisions. In Emerson Electric Co. v. Farmer, 427 F.2d 1082 (5th Cir.1970) the Fifth Circuit in referring to F.R.C.P. Rule 41(b) said: `The Judge should now ordinarily evaluate the evidence without making special inferences in the Plaintiff's favor. The Court should go ahead and resolve the case on the basis of preponderance of the evidence.' 427 F.2d at 1086.
"In civil cases, following a complete trial, the trial judge has the responsibility to weigh and evaluate all evidence and ultimately render a decision based upon a preponderance of evidence. Suppose here following the plaintiff's case in chief the defendant rested without presenting any evidence. Then the trial court would render its decision based upon the same facts it had when plaintiff rested. The outcome in this example would be the same as we now have before us with the granting of a directed verdict. Realistically, this defendant would not offer any evidence if this case was remanded for further proceedings. The district judge must eventually render a decision and it is reasonable and logical for him to apply the same standard to evidence following a motion for directed verdict or following a completed trial. Despite the harsh results of a directed verdict, we have no alternative but to apply the standard of preponderance of evidence under the provisions of Art. 1810(B)." (at 1012-13).
The main thrust of Metro's argument is that by controlling the amount and interest rate for loans made by NOPSI to its subsidiary, Systems, Fuel, Inc., by allocating certain costs into one company or the other, by creating unnecessary, repetitive and extraneous executive and administrative branches and personnel in both companies, by allocating non-fuel costs of operation and maintenance into the fuel adjustment cost formula, and by engaging in the costly and risky business of oil field exploration, NOPSI can artificially inflate or decrease its "cost" and funnel those elements through the fuel-adjustment clause in an attempt to circumvent public regulation.
As seen by the above statement of Metro's allegations, the instant case involves a massive amount of proof in the nature of business records, detailed accounting and "tracing" of funds, examination of the work performed by various departments of both companies, the hierarchial structure of both companies as well as the entire Mid-South System, and an *1216 examination of fuel purchases on a case-by-case basis. That proof was simply not presented at trial. We find, as did the trial court, that plaintiff failed to carry its burden of proof. Accordingly, the trial judge properly granted defendants' motions for a directed verdict.
For the reasons discussed the judgment of the district court is affirmed.
SCHOTT and SAMUEL, JJ., concur.
SCHOTT, Judge, concurring:
The injunctive relief sought by plaintiffs to require the City Council to hold monthly public hearings with respect to the imposition of NOPSI's fuel adjustment charge on consumers is based on this court's decision in Bagert v. Moreau, 325 So.2d 702 (La.App. 4th Cir.1976).
In Bagert the trial court had issued a peremptory writ of mandamus ordering the Council to hold such hearings as required by § 4-1604 of the Home Rule Charter of the City of New Orleans. This court reversed holding that 1) § 4-1604 was not applicable because its notice provisions did not apply to consumers; but 2) § 3-112(5) in conjunction with § 4-1604 would require the council to engage in the procedure of resolution or ordinance passing with attendant notice by publication in order to impose NOPSI's fuel adjustment clause on consumers if 3) plaintiff could establish that NOPSI has control over the amount of the fuel adjustment charges to be paid by consumers. The court reasoned that these charges would be a rate or price change by NOPSI if it controlled them.
However, because the evidence on the nature of the charges was "incomplete" the court remanded the case to the trial court "for the limited purpose of hearing evidence on: what a fuel adjustment cost is, what governmental agency or supplier determines the cost, whether NOPSI .... exercise[s] control over the amount which is passed on to the consumer ...." Plaintiffs in the instant case contend they have met the requirements of Bagert and thus established the requirement for a public hearing.
The fuel adjustment charge is a fairly simple concept. Built into the authorized rates NOPSI charges for electricity is a base cost for the fuel consumed in generating electricity. However, because fuel costs fluctuate over such a wide range on a day to day basis and because they are such a substantial component in the cost of producing electricity NOPSI is authorized to pass on to its consumers the increase over the base cost of fuel built into the rates.
In practice this simple concept becomes highly technical and complex. In order to supply a vast number of consumers with electricity NOPSI continuously consumes a tremendous supply of fuel. It is faced with wide fluctuations of demand for electricity which produces shortages and surpluses of fuel on a day to day basis, it must maintain extensive facilities for handling and storage of fuel, it must cope with a market for fuel which fluctuates wildly and unpredictably, it must make choices as to the type of fuel to be burned, i.e., fuel oil or gas, and it must restrict its purchases of oil to qualities consistent with sound environmental considerations. The record establishes that NOPSI's primary concerns are to keep its customers supplied with their electrical requirements by purchasing the necessary amount of fuel for this purpose and to pay the lowest possible price for the fuel over the long run.
In order to meet these concerns NOPSI and three related utilities in the Middle South System established a wholly owned subsidiary, Systems Fuel, Inc., a non profit corporation, which purchases fuel oil in great volume and resells it to its parent companies providing electricity throughout Louisiana, Mississippi and Arkansas. But the task of supplying fuel becomes even more complex because of variations in the amount of fuel oil available to the operating companies and its cost on a daily basis.
At times NOPSI must switch to burning natural gas instead of fuel oil so that it maintains a gas purchase contract with United Gas Company under the terms of which the price of the gas is pegged to the cost of fuel oil charged by Systems Fuel, *1217 Inc. As a further complication, the other operating companies frequently find themselves with a surplus of electricity generated for the most part from fuel oil sold to them by Systems Fuel, so that NOPSI purchases electrical energy from its sister companies. An intricate system of exchanging electrical energy among the four companies to meet changing demands is managed by a committee composed of representatives of the companies. Finally, despite all of these elaborate arrangements, NOPSI must still, from time to time, make direct purchases of fuel and electrical energy from outside sources to keep its customers supplied.
Thus, the fuel adjustment charge is based not only on the cost of raw fuel purchased by NOPSI but also on the fuel cost component of the price of electricity purchased by NOPSI and resold to its customers.
Most of plaintiffs' evidence was centered around NOPSI's relationship with Systems Fuel. They established that NOPSI makes loans to Systems which in turn includes the interest paid to NOPSI as a component in the cost of its fuel. Systems pays the salaries of some NOPSI employees who handle the fuel before it is consumed and Systems pays rent to store and handle fuel on NOPSI property before its consumption. Such "administrative" costs are also components of the cost of Systems' fuel. Plaintiffs also produced some vague testimony that Systems incurred expenses in exploring for oil unsuccessfully and including this expense as a component in its fuel cost.
Much of plaintiffs' evidence was intended to prove that the interrelationship among the Middle South Companies resulted in decisions about the exchange of generated electricity which are not in the best interests of NOPSI customers but, rather, were to the economic advantage of the companies.
As I interpret Bagert, it was plaintiff's burden of proof in this case to establish that the fuel adjustment charge is a mechanism whereby NOPSI controls the amount which is passed on to its customers in such a way that NOPSI derives additional revenue and profit over and above that which is included in the rate structure approved by the council. Plaintiffs could not prevail if the evidence showed that the cost of fuel was controlled by a governmental agency or supplier. I am satisfied that plaintiffs did not prove their case. On the contrary, the fuel adjustment clause is controlled by suppliers in the market place and NOPSI's arrangements make it possible for it to purchase fuel at the lowest practical price which is passed on to consumers. NOPSI exercises control, but not in the sense prohibited by Bagert. Its control savesnot costsmoney for consumers.
At the trial plaintiffs produced an expert witness in the field of utility economics who summarized the position of plaintiffs in the case. He repudiated any notions that NOPSI was abusing its customers in any way, but stated:
".... when these costs are passed through the fuel adjustment clause essentially or effectively they are missing any regulatory overview and we will never really know if consumers have been overcharged or not, which is the point. The point is not necessarily that the charges have been too great or there have been some irregularities, but the point is if we don't have the hearings we simply don't know ...."
When further questioned this witness made it clear that he was committed to public hearings as the only proper mechanism to regulate utilities and that audits by the Council would not suffice.
There are several problems with this witness's position: First, in Bagert we held that public hearings were not necessarily required as monitoring devices for fuel adjustment charges; second, plaintiff's evidence established that the City does audit NOPSI's records on an ongoing basis to protect against overcharges; and, third, in the light of plaintiff's evidence monthly hearings on NOPSI's fuel adjustment charges would be exercises in futility with the only logical result each time being approval of the charge. In the event that NOPSI should abuse the privilege of the fuel adjustment charge and this abuse is *1218 detected and proved consumers would have a cause of action for a refund, but no useful purpose would be served by having public hearings on the charges on an ongoing basis.
The trial court dismissed plaintiff for the principal stated reason that the decision by the Council to allow the fuel adjustment clause was an administrative one with which the court should not interfere unless the decision was arbitrary. The court did not allude to the Bagert case and did not reach the conclusion as I have that the fuel adjustment is not "a rate or price change requiring notice and a public hearing as contemplated in the charter." This reasoning by the trial court is also the main thrust of NOPSI's argument, to wit, authorization or adoption of the fuel adjustment clause is a policy decision of the regulatory body with which the courts should not interfere. While there is merit to this position I see no need to address it because the case is controlled by Bagert as a prior opinion of this court and applying the law of that case to the facts of this one the result reached by the trial court was correct.
As a postscript, the fuel adjustment clause has been attacked in many jurisdictions throughout the United States without success, and these cases are informative and instructive. See State Ex Rel. Utilities Commission v. Edmisten, 291 N.C. 327, 230 S.E.2d 651 (1976). In City of Norfolk v. Virginia Elec. & Power Co., 197 Va. 505, 90 S.E.2d 140 (1955) the court made the following observation which is apropos:
"The proposed escalator clause is nothing more or less than a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates. Hence, the resulting rates under the escalator clause are as firmly fixed as if they were stated in terms of money."
The evidence of plaintiffs in this case leads me to conclude that NOPSI's fuel adjustment clause, although highly complex in its implementation, is essentially the same as that described above by the Virginia Court and is not "a rate or price change requiring notice and a public hearing."
SAMUEL, Judge, concurring.
For the reasons expressed by Judge Schott in his concurring opinion, I respectfully concur.