NEW ORLEANS PUBLIC SERVICE, INC., Plaintiff,

**Ernest Morial, et al., Individually and As Representatives of a Class, Applicants for Intervention-Appellants,**

v.

**UNITED GAS PIPE LINE COMPANY, Defendant-Appellee.**

No. 82–3194.

United States Court of Appeals, Fifth Circuit.

May 21, 1984.

Rehearing Denied June 21, 1984.

McGlinchey, Stafford & Mintz, Donald R. Mintz, Constance Charles Willems, New Orleans, La., for Ernest Morial et al.

Lemle, Kelleher, Kohlmeyer & Matthews, C. Murphy Moss, Jr., Robert G. McIver, Victoria L. Knight, New Orleans, La., James M. Costan, Kevin W. McLean, Douglas Knox Bemis, Jr., W. DeVier Pierson, Washington, D.C., for defendant-appellee.

Before CLARK, Chief Judge, BROWN, GOLDBERG, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.[*]

GARWOOD, Circuit Judge:

This diversity case brings to our en banc consideration questions pertaining to the entitlement of third parties to intervene as plaintiffs in a contract action brought by a local electric utility against its major fuel supplier. The district court denied all requested intervention. The decision of the panel, as modified on rehearing, though declining to disturb both the denial of intervention to the electricity consumers and the determination that officials of the city which franchised the electric utility were

---

[*] Judge Goldberg, a senior judge of this circuit, is participating as a member of the panel initially deciding the appeal now subject to en banc review. 28 U.S.C. § 46(c).

not entitled to intervene as of right, held that the district court abused its discretion in denying the city officials permissive intervention. 690 F.2d 1203, *modified on rehearing*, 694 F.2d 421 (5th Cir.1982). This court en banc, disagreeing with the latter determination, now holds that the city officials were properly denied intervention.

## CONTEXT FACTS

### NOPSI and United

New Orleans Public Service, Inc. ("NOPSI"), a Louisiana corporation, plaintiff in this action, is an investor-owned utility providing natural gas and electricity to residential, business, industrial and other end use consumers in New Orleans, Louisiana. NOPSI is a subsidiary of Middle South Utilities, Inc., a much larger concern having other electric utility subsidiaries in the region. United Gas Pipe Line Company ("United"), defendant below and appellee here, a Delaware corporation headquartered in Texas, owns and operates an interstate natural gas transmission system, and transports and sells natural gas in interstate commerce in Texas, Louisiana, and other states to gas distribution concerns which resell the gas to local residential and other gas consumers. United also sells directly to industrial customers which use the gas in their own operations, and to other interstate pipeline systems. NOPSI purchases gas from United both for resale to its gas consumer customers ("Resale Gas"), and for NOPSI's own use as boiler

fuel to generate the electricity which NOPSI sells to its electricity consumer customers ("Power Plant Gas"). Though initially NOPSI's purchases from United of both Power Plant Gas and Resale Gas were covered by a single contract, subsequently the Power Plant Gas came to be covered by a separate contract between those parties. The instant litigation relates solely to the Power Plant Gas contract, particularly its pricing provisions.

United is a principal supplier—perhaps the principal supplier—of boiler fuel used in NOPSI's three electric generation plants. NOPSI acquires some Power Plant Gas from suppliers other than United, but these sources apparently are not able to furnish more than a fraction of NOPSI's total fuel requirements.[1] NOPSI's plants, or at least the two larger ones, are also capable of burning all grades of fuel oil, and NOPSI has from time to time used fuel oil for the boiler fuel in these plants, when it was cheaper than gas and when gas deliveries were curtailed. However, NOPSI prefers to use gas, as it is cleaner and more efficient.

In 1952 NOPSI and United entered into a contract for NOPSI to purchase from United, during a term expiring on June 1, 1975, all NOPSI's Resale Gas, and Power Plant Gas to the extent of all the fuel requirements of NOPSI's electric power plants.[2] The contract contained provisions for maximum daily amounts of Power Plant Gas, and of all gas, which United would be required to deliver, as well as provisions for increasing these maximums, and in gen-

---

1. This fraction appears to be in the neighborhood of one sixth at peak summer loads, though larger during the winter when the requirements are about halved. NOPSI also from time to time "imports" or "exports" electricity from or to other electric utilities in the region which are also subsidiaries of Middle South Utilities, Inc. *See also Metropolitan New Orleans Chapter of the Louisiana Consumer's League, Inc. v. Council of the City of New Orleans*, 423 So.2d 1213, 1216–17 (La.App.1982), *cert. denied*, 430 So.2d 77 (La.1983).

2. The contract's initial "whereas" clause states:
 "WHEREAS, Buyer owns and operates distribution lines and facilities in the Parish of Orleans, Louisiana, and two steam electric

power plants in said Parish known as Buyer's Market Street and Industrial Canal Stations, and desires to purchase from Seller gas for resale and distribution through said distribution lines and facilities to Buyer's residential, commercial and industrial consumers in the Parish of Orleans, Louisiana, and for the fuel requirements of said two power plants and any additional such plant or plants that Buyer may construct and operate in said Parish of Orleans ...."
 Our description of the terms of this and subsequent contracts is given as part of the general background of this litigation and is not intended to be complete and precise in all details.

eral allowing NOPSI to acquire its power plant fuel elsewhere to the extent that United would not meet requested deliveries over the maximums. A clause was also included generally providing for ratable curtailment, first of Power Plant Gas and then of Resale Gas, "in the event a shortage of gas renders Seller unable to supply the full gas requirements of all its customers, including Buyer ...." Power Plant Gas was priced at 13 cents per thousand cubic feet (mcf) until 1960, with provision for increases at five-year intervals thereafter, to be determined by negotiation based on United's estimated increased costs. Resale Gas was priced according to rate schedules filed and to be filed with the Louisiana Public Service Commission (initially listing 19 cents per mcf for "domestic" gas). When the contract was executed the gas all came from a Louisiana intrastate system then operated by United, and was hence not subject to federal regulation under the Natural Gas Act. Thereafter, United apparently caused this system to become a part of its interstate system. As a result, in 1973 the Federal Power Commission ("FPC," now the Federal Energy Regulatory Commission, "FERC") granted United a "certificate" under the Natural Gas Act covering its furnishing of gas to NOPSI, and the price at which United sold NOPSI Resale Gas became and remains regulated by that federal agency. However, the price of United's Power Plant Gas sales to NOPSI is not and was not regulated under either federal or state law.[3]

The 1952 contract was amended on at least one occasion, a 1965 amendment having increased the price of Power Plant Gas to 23 cents per mcf.

On January 31, 1975 United and NOPSI entered into two separate agreements. One, a "Service Agreement," pertained only to Resale Gas, expressly superseded and canceled the 1952 agreement so far as it covered Resale Gas, and was to "become effective on such date as allowed by the Federal Power Commission" and to remain in effect until June 1, 1985.[4] The other,

---

**3.** The Natural Gas Act, 15 U.S.C. § 717 *et seq.*, provides for the regulation of the transportation of natural gas in interstate commerce, of the sale in interstate commerce of natural gas "for resale," and of companies engaged in such transportation or sale. 15 U.S.C. §§ 717(b), 717a(6). Under the Act, sales of gas in interstate commerce for resale, such as United's sales of Resale Gas to NOPSI, must be at "just and reasonable" prices and are subject to FERC rate regulation. 15 U.S.C. §§ 717c, 717d. State regulation of such interstate sales for resale is forbidden. *Missouri ex rel. Barrett v. Kansas Natural Gas Co.*, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 (1924). But the Natural Gas Act does not speak to, or authorize FERC rate regulation respecting, the price at which gas is sold in not-for-resale or "direct" sales, such as United's sale of Power Plant Gas to NOPSI; and the states are free to provide rate regulation of such "direct" sales, even those in interstate commerce. *Pennsylvania Gas Co. v. Public Serv. Comm'n*, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 (1920); *Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947). *See also Cities Service Gas Company v. United States*, 500 F.2d 448, 205 Ct.Cl. 16 (1974). Louisiana, nevertheless, does not regulate such "direct" sales, whether intrastate or interstate. LSA–R.S. 45:1163. The Natural Gas Act does provide, however, that the furnishing of gas in interstate commerce, including that to "direct" sales (as well as resale) customers, must be pursuant to a FERC certificate of public convenience and necessity, and that no portion of such service can be abandoned without prior FERC approval. 15 U.S.C. § 717f(b) & (c). *See FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

While United's transformation of its Louisiana intrastate system into an interstate one has been subject to attack in other proceedings, *see FPC v. Louisiana Power & Light Co., supra*, all here concerned admit, at least for purposes of this litigation, that United's sales to NOPSI of Resale Gas are, and of Power Plant Gas are not, subject to FERC rate regulation, that neither is subject to any direct state or municipal regulation, and that United's furnishing to NOPSI of each kind of gas is subject to the abandonment requirements of the Natural Gas Act (15 U.S.C. § 717f(b)). Moreover, while United's various gas curtailments, commencing in the early 1970's, including those "authorized" by the FPC, have sparked considerable litigation between United and various of its customers, including NOPSI, *see State of Louisiana v. FPC*, 503 F.2d 844 (5th Cir.1974); *City of New Orleans v. United Gas Pipe Line Company*, 390 F.Supp. 861 (E.D.La.1974), such controversies are not involved in the present litigation.

**4.** The Service Agreement provides that the price of gas sold thereunder was that fixed by United's current rate schedule, or any effective superseding rate schedule, on file with the FPC,

that pertinent here, was a January 31, 1975 letter agreement dealing with Power Plant Gas. This letter states that it is an "interim agreement with respect to Power Plant Gas." It recites that the 1952 contract, as amended, will expire on June 1, 1975, has been replaced as to Resale Gas by the Service Agreement, and will not be renewed as to Power Plant Gas. The letter then makes essentially two sets of substantive provisions. First, it amends parts of the 1952 contract so far as it pertains to Power Plant Gas sold from January 1, 1975 until its June 1, 1975 expiration, principally by fixing the price during that period at United's Weighted Average Cost of Gas ("WACOG," apparently then about 50 cents per mcf). The second set of provisions are those with which we are concerned. They deal with the sale of Power Plant Gas after June 1, 1975, when the 1952 agreement expires. In this connection, it is recognized that United may apply to the FPC for abandonment of its Power Plant Gas service to NOPSI "effective on or after June 1, 1975," and the "parties agree that any controversy over whether Power Plant Gas service should continue after the expiration of the [1952] Contract will be resolved solely in the abandonment proceedings before the Federal Power Commission." No obligation is imposed on NOPSI to take Power Plant Gas after June 1, 1975. United is authorized, without liability to NOPSI, to curtail deliveries after June 1, 1975 "pursuant to Seller's Impairment of Deliveries provisions from time to

time in effect under Seller's Federal Power Commission Gas Tariff." [5]

Paragraph 4 of the 1975 letter agreement deals with the price of Power Plant Gas delivered from June 1, 1975 "until Seller is authorized to abandon Power Plant Gas service." Under paragraph 4A1, this price is initially fixed at 61.84 cents per mcf in excess of United's WACOG for each respective billing month.[6] That price was to remain in effect until June 1, 1976, or the date on which United instituted a "redetermined rate," whichever was later. The present controversy particularly relates to paragraph 4A2 of the 1975 letter, providing that United could, at any time or times after June 1, 1976, unilaterally "institute a redetermined rate," to remain in effect not less than one year, by giving NOPSI sixty days' notice of the specified new rate. If NOPSI did not within thirty days notify United that it agreed to that rate, then NOPSI would "cease taking gas on the date such rejected redetermined rate was to be instituted."

The WACOG plus 61.84 cent per mcf price remained in effect until the January 31, 1975 letter agreement was amended by another letter agreement dated August 22, 1978.[7] This amendment apparently came about because the price of available fuel oil dropped below that of United's Power Plant Gas on an equivalent Btu basis, and NOPSI accordingly reduced its Power Plant Gas purchases from United and began burning fuel oil instead.[8] The August

and that it was subject to the General Terms and Conditions of the rate schedule as filed with the FPC. The Service Agreement also stated a Maximum Daily Quantity of gas which United was obligated to deliver and NOPSI to take thereunder.

5. Provision is made for a possible penalty payment by United to NOPSI in the event United's deliveries to NOPSI during the period June 1, 1975 to June 1, 1976 total less than United's deliveries to NOPSI from January 1, 1975 to June 1, 1975.

6. This was actually expressed as $1.0125 per mcf, plus or minus the amount by which United's WACOG for the billing month exceeded or was less than its July 1974 WACOG. As the July 1974 WACOG was 39.41 cents per mcf, the effect

was a price per mcf equal to whatever United's WACOG was from time to time, plus 61.84 cents ($1.0125 minus .3941).

7. This agreement recites that the 1952 contract had expired June 1, 1975 and that the January 31, 1975 letter constituted the parties' agreement as to the price of Power Plant Gas delivered after the 1952 contract's expiration.

8. On United's inquiry concerning the reduction, NOPSI responded that fuel oil was cheaper and it was going to buy the lowest cost fuel. The NOPSI vice president concerned also stated that NOPSI's objective in those 1978 negotiations was "to arrive at a price that we could justify to our regulatory body that we were doing the best we could for our customers insofar as the im-

1978 amendment modified paragraph 4A1 of the 1975 agreement, dealing with the price of Power Plant Gas sold after June 1, 1975, by providing that, from August 1, 1978 "until Seller is authorized [by FERC] to abandon Power Plant Gas Service," the price for Power Plant Gas furnished each month would be the cost to NOPSI of the # 6 fuel oil with equivalent Btu content used that month as boiler fuel at NOPSI's Michoud electric generating station. However, the price per mcf would in no event be greater than 71.84 cents, nor less than 51.84 cents, in excess of United's WACOG for the same month. It was also provided that no "redetermined rate" would be put in effect prior to August 1, 1979. A November 1978 amendment increased the maximum and decreased the minimum price, each by five cents per mcf, so that the maximum became 76.84 cents, and the minimum 46.84 cents, in excess of United's WACOG for the billing month. Within that range, the price remained the price of NOPSI's fuel oil, on a Btu equivalent basis, as provided in the August 1978 agreement.[9]

This Power Plant Gas price formula continued in effect, and there were no further amendments to the 1975 agreement, until on March 3, 1981 United sent NOPSI a notice, pursuant to paragraph 4A2 of the 1975 agreement, of a "redetermined price" of Power Plant Gas to take effect May 3, 1981, thus precipitating the present litigation. This "redetermined rate" provided for a price equal to United's WACOG for the month in question plus 91 cents per mcf for minimum quantities nominated in advance by NOPSI, generally on a take-or-pay basis. For gas in excess of the minimum, the price would be the current regional # 6 fuel oil price on an equivalent Btu basis but not less than 61 cents per mcf, nor more than $1.06 per mcf, in excess of United's WACOG for the month.[10] NOPSI calculated that this would produce an average increase over the ensuing year of about 25 cents per mcf, or 7.5 percent, in the cost of Power Plant Gas purchased from United.[11] NOPSI protested the increase and negotiations ensued. After granting NOPSI additional time to respond and making certain technical modifications NOPSI had requested, United informed NOPSI by letter of April 27, 1981 that if NOPSI did not accept the "redetermined rate" by May 19, 1981 "United will charge NOPSI the fair market value for any gas taken by NOPSI on and after May 3 inasmuch as no contractual or other understanding would exist as to price."

On May 18, 1981 NOPSI signed the United letter agreements providing for the "redetermined rate," contemporaneously informing United that NOPSI was doing so with reservation of rights and because United's April 27 letter had said United would otherwise charge fair market value.

### Proceedings Below

On May 26, 1981 NOPSI instituted the present litigation by filing suit against United.[12] NOPSI's complaint outlined the

pact that the fuel costs have on the cost of electricity to them."

9. The November 1978 agreement made no other changes, and apparently left in effect the "redetermined price" provisions of paragraph 4A2 of the 1975 letter agreement as modified by the August 1978 agreement.

10. The method of calculating United's WACOG was also changed to United's advantage to the extent of approximately four cents per mcf, and provision was made for future adjustments, based on changes in the Producer Price Index for Finished Goods, in the $1.06 and 91 cent figures. United also would have the right to institute "redetermined rates" after May 1982.

11. These prices were apparently below the then current fuel oil prices, so that the 91 cent and

$1.06 (over United's WACOG) maximums would likely be applicable. The estimate of increase, however, proved somewhat conservative. When the "redetermined rate" went into effect May 3, 1981 it appears to have increased the cost of United's Power Plant Gas from $3.5967 to $3.9558 per mcf. Fuel oil cost to NOPSI, relative to the cost of United's Power Plant Gas, varied: in June 1981 the cost of such gas was about 3.5 percent less than the fuel oil on a Btu equivalent basis; in April 1981 the gas cost was some 2.5 percent more than the fuel oil cost.

12. The suit was filed in state court and promptly removed by United to federal court on grounds of diversity of citizenship.

history of its relations with United, including the 1952 contract, which it alleged "terminated on 1 June 1975," and the January 31, 1975 letter agreement and its August and November 1978 modifications.[13] It alleges that on "January 31, 1975 United and NOPSI entered into a letter agreement for the purpose of definitively determining the rate or price per thousand cubic feet (Mcf) NOPSI would pay and United would receive for all Power Plant Gas delivered by United on and after 1 June 1975 and until United obtained FPC abandonment authorization," and quotes paragraph 4A1 of the 1975 letter providing for a price fixed at United's billing month WACOG plus 61.84 cents per mcf. It further alleges that in the August and November 1978 letters "NOPSI and United agreed upon a price to be paid by NOPSI for Power Plant Gas '... until Seller [United] is authorized by the Federal Energy Regulatory Commission (formerly the Federal Power Commission) to abandon Power Plant Gas service' as therein provided."

The complaint states that NOPSI agreed to United's 1981 redetermined rate "under the duress" of United's "threat" by its April 27, 1981 letter to charge "fair market value" for the Power Plant Gas and United's subsequent oral statement "that it would contend that a fair market value for Power Plant Gas on and after May 3, 1981 would be $6.00 to $8.00 per Mcf," which would be more than double what NOPSI paid United for Power Plant Gas in 1980.[14]

It also alleges that the provision of paragraph 4A2 of the 1975 agreement authorizing United to institute a "redetermined rate" is "invalid and unenforceable because the redetermined rate therein provided for is an uncertain price, being neither fixed nor determinable by some objective criterion or by agreement," and hence violates specified articles of the Louisiana Civil Code.[15] Accordingly, it is claimed that the price provision of paragraph 4A1 of the 1975 agreement, as modified by the August and November 1978 agreements, is controlling.[16] The only relief sought is declaratory judgment in four respects: (1) that NOPSI's consent to the 1981 redetermined rate "is void as having been procured by duress"; (2) that the provision of paragraph 4A2 of the 1975 agreement (and the similar provision in paragraph 4 of the August 1978 agreement) authorizing unilateral price redetermination by United "are void and unenforceable"; (3) that "the price at which defendant is obligated to sell and NOPSI to buy Power Plant Gas until United is authorized by the Federal Energy

13. Copies of the 1975 and 1978 letter agreements were attached to the complaint.

14. NOPSI did not claim that United expressly or impliedly threatened to suspend or curtail Power Plant Gas (or Resale Gas) deliveries or to seek FERC permission to abandon. Indeed NOPSI alleged that "United has never applied for" or been granted such permission. The duress, as NOPSI stated in its answers to requests for admission, was that "if United had carried out its threat [to charge $6 to $8 per mcf if NOPSI did not agree to the "redetermined rate"] NOPSI would have found it necessary to immediately approximately double its electric rates or run the risk of a great financial loss should the courts hold that United's threatened increase was valid ...."

15. The articles cited are LSA–C.C. articles 1764 subd. A, par. 1 ("a price is essential to the contract of sale"), 2439 (for a contract of sale there must be "the thing sold, the price and the consent"), 2456 (sale perfected between parties "as soon as there exists an agreement for the object and for the price thereof"), 2464 ("the price of the sale must be certain ... fixed and determined by the parties"), and 2465 (price may be left to arbitration, but if arbitrator unable or unwilling to estimate "there exists no sale"). The complaint further alleges, "in the alternative, and only in the event" that the provision authorizing United to institute a "redetermined rate" is not invalid under the cited articles, that it is invalid because its unlimited and unilateral character "without providing for consultation with NOPSI" violates "the requirements of equity" of LSA–C.C. articles 1964 ("equity" may "supply ... incidents" to a contract) and 1965 ("when the law of the land, and that which the parties have made for themselves by their contract, are silent," courts will determine "incidents to a contract" according to the principles of the golden rule and against one enriching himself "at the expense of another").

16. Namely, the price tied to NOPSI's Btu equivalent #6 fuel oil costs, but not less than 46.84 cents, nor more than 76.84 cents, in excess of United's WACOG for the billing month.

Regulatory Commission to abandon Power Plant Gas service to NOPSI is that specified in Paragraph 4A1 of the letter agreement of January 31, 1975" as amended by the August and November 1978 letter agreements; and (4) that any payments by NOPSI to United for Power Plant Gas under the "redetermined rate" instituted as of May 3, 1981 "be refunded to NOPSI" to the extent they exceed the amounts payable under the price provisions of paragraph 4A1 of the 1975 letter agreement as amended by the August and November 1978 agreements.

United filed its answer on June 16, admitting the basic facts alleged in NOPSI's complaint and taking the position that United engaged in no duress respecting NOPSI's agreement to the 1981 redetermined rate and that NOPSI was bound thereby; that with respect to a redetermined rate NOPSI had the choice of agreeing to it, or of ceasing to take Power Plant Gas from United, or of purchasing such gas from United at its fair market value; that the price redetermination provision of paragraph 4A2 of the 1975 agreement (as amended by the August 1978 agreement) was valid; and that NOPSI was barred by laches, waiver and estoppel from contending otherwise.[17]

On August 26, 1981 Ernest Morial moved to intervene in the litigation "as a party plaintiff," individually and as representative of the class of NOPSI electric customers.[18] No action was taken on this motion. On October 6, 1981 an amended motion was filed seeking intervention "as party plaintiffs herein" under Rule 24(a), Fed.R. Civ.P., on behalf of Morial, several other persons and businesses, and the City of New Orleans, in each case individually and as representatives of the class composed of all NOPSI electric rate payers. The then tendered amended petition in intervention recites that the intervenors are NOPSI electricity customers, that "the City of New Orleans, acting through its City Council, is, in addition to being a purchaser of electricity, a rate regulatory body, and, through its City Council, establishes NOPSI's rates," and that "the increased cost of power plant gas, which NOPSI uses to generate electricity, is charged to Intervenors in the form of increased fuel adjustment charges. Intervenors are thus paying the most significant portion of the increased cost of power plant gas."[19] The

---

17. At the same time, United also filed a counterclaim against NOPSI which additionally took the positions: that in the event the court determined that NOPSI's agreement to the 1981 redetermined rate was not binding, then United should have judgment against NOPSI for the excess of the fair market value of Power Plant Gas taken by NOPSI from United since May 3, 1981 over what NOPSI had paid therefor (the redetermined rate); and that in the event that the court determined that not only was NOPSI's 1981 agreement not binding on it but also that the price redetermination provision of paragraph 4A2 of the 1975 agreement was invalid and not binding on NOPSI, then United should have judgment against NOPSI for the excess of the fair market value when delivered of Power Plant Gas taken by NOPSI from United since June 1, 1975 over what NOPSI had paid United therefor. NOPSI filed its answer to the counterclaim on July 6, 1981.

18. Though not stated in the motion or accompanying papers, Morial was and is the Mayor of New Orleans. When the motion was filed some preliminary discovery had already taken place, including oral depositions of United and NOPSI officers and interrogatories from each party to the other.

19. Generally, about 60 percent of the cost of electricity to NOPSI consumers is represented by the cost to NOPSI of the boiler fuel used in its electric generating plants.

Under Louisiana law electric utilities such as NOPSI, and the rates they charge their consumer customers, are regulated by the Louisiana Public Service Commission (the "Commission"), except that home-rule cities, such as New Orleans, perform this regulatory function within their borders, unless the city voters approve transfer of that function to the Commission. LSA-Const. Art. 4 § 21(B) & (C). *See State ex rel. Guste v. Council of City of New Orleans*, 309 So.2d 290, 292–93 (La.1975). The 1922 ordinance under which NOPSI holds its franchise from the City of New Orleans provides that NOPSI is "authorized to charge and collect such fair and reasonable rates for electrical energy furnished and delivered in the City of New Orleans as may be established by the City of New Orleans and or other regulatory authority in accordance with law." By virtue of an election held November 28, 1981, pursuant to an ordinance adopted by the City on July 23, 1981, effective January 1, 1982, all the City's rate and other regulatory authority over NOPSI (and certain other utilities) was transferred to the Com-

amended petition in intervention expressly adopts the allegations of NOPSI's complaint, but does not otherwise allege any substantive claim or ground for relief. It also seeks precisely the same relief as sought in NOPSI's complaint, with the sole exception of requesting that the refunds which NOPSI's complaint seeks from United be paid "to NOPSI and the [rate payer] Class jointly" (instead of just to NOPSI).

In a supporting memorandum filed with the amended petition in intervention, the intervenors claimed the right to intervene because the contract between NOPSI and United was a *stipulation pour autrui,* or third-party beneficiary contract, in their favor, and because they paid, through electricity charges paid to NOPSI, the amounts received by United from NOPSI in excess of what United was entitled to be paid

mission so that, as the ordinance states, the City shall "no longer have any powers of supervision, regulation and control over gas, heat, power and electric public utilities."

The City and the Commission, during their respective periods of regulating NOPSI's rates, approved its electricity rate schedules containing a "fuel adjustment clause" by which NOPSI has been generally authorized to increase its electric charges every month to the extent of (but without a profit margin on) increases in its boiler fuel and purchased power costs incurred in the second preceding month, with this item separately identified on the customer's bill. We understand that the Commission holds monthly hearings on the cost figures used in these computations. The City Council apparently did not hold such hearings as a matter of course, but did "audit NOPSI's records on an ongoing basis to protect against overcharges" in this connection. *See Metropolitan New Orleans Chapter of the Louisiana Consumer's League, Inc. v. Council of the City of New Orleans,* 423 So.2d 1213, 1217 (La.App.1982), *cert. denied,* 430 So.2d 77 (La.1983). Plainly, under Louisiana law neither the City nor the Commission is required to authorize use or continued use of "fuel adjustment" clauses in filed rate schedules, such clauses being simply a procedural device employed by the regulatory authority in carrying out its rate-fixing function.

Under LSA–R.S. 45:1176, the Commission and any "municipal body having similar powers in the fixing of just and reasonable rates ... charged by public utilities, shall investigate the reasonableness and justness of all contracts, agreements and charges entered into or paid by such public utilities ... and shall have the power to disallow as an operating expense of any public utility such part of the amount so paid ... as the commission ... or municipal body may find, after hearing, to be unjust or unreasonable and designed for the purpose of concealing, abstracting or dissipating the net earnings of the public utility." *See Central La. Elec. Co. v. Louisiana Pub. Serv. Comm'n,* 373 So.2d 123 (La.1979); *South Cent. Bell Tel. v. Louisiana Pub. Serv. Comm'n,* 373 So.2d 478, 484 (La.1979) (recognizing "the Commission's authority to regulate the industry as an efficient enterprise, rather than as a luxurious one ...").

We understand that Commission rules authorize any party "actually in interest," local officials and "every civic and trade organization," including consumer groups, to appear and participate in rate proceedings. While the Commission at one time amended these rules so it could deny such parties intervenor status (apparently necessary for appeal to the courts from Commission orders), this amendment was held invalid on procedural grounds, *Louisiana Consumers' League, Inc. v. Louisiana Pub. Serv. Comm'n,* 351 So.2d 128 (La.1977), and we are informed that the previous rule, authorizing intervention, remains in force. Under LSA–R.S. 45:1192, an appeal may be filed within three months after a Commission order, and Louisiana courts have entertained appeals by rate payers from Commission rate orders. *See, e.g., Monochem, Inc. v. Louisiana Pub. Serv. Comm'n,* 172 So.2d 670 (La.1965); *Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm'n,* 369 So.2d 1054 (La.1979).

With Commission-sanctioned security, a utility may effectuate an increased rate before its approval by the Commission, but if the rate is not ultimately approved refund must be made, as it must also if a Commission-approved rate is implemented and later overturned on court appeal. LSA–Const. Art. 4 § 21(D); LSA–R.S. 45:1163.1. However, where a utility recovers from a supplier excess charges paid in respect to periods when a utility's rates were Commission approved and unchallenged in court, it is unclear whether the Commission can order the utility to make a true refund to the rate payers. The Commission has apparently done so in at least one instance, but there is authority that it lacks this power. *See City of New Orleans v. United Gas Pipe Line Co.,* 438 So.2d 264 (La. App.), *writs denied,* 442 So.2d 463 (La.1983). *Cf. Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm'n,* 377 So.2d 1023, 1027–29 (La.1979).

The City and the Commission, while each regulated NOPSI's rates, have apparently allowed NOPSI's increased fuel costs resulting from United's May 3, 1981 price increase to "pass through" in the form of higher electric rates, seemingly without any regulatory action being attempted by the regulatory bodies themselves or third parties to prevent, minimize or condition this.

under its contract with NOPSI. They also asserted NOPSI's representation was inadequate because NOPSI requested that the refund sought from United be paid to NOPSI, rather than to NOPSI and the rate payers, but did not allege that NOPSI was in collusion with United or had not vigorously pursued its suit against United or would not do so.

United opposed the intervention. The amended motion to intervene was heard by the magistrate, who, by a November 6, 1981 minute entry, allowed Morial (the Mayor), and the seven individual intervenors who comprised the New Orleans City Council, to permissively intervene under Rule 24(b) "individually, not as a class." All other requested intervention was denied. United and the intervenors each sought review in the district court. Following a December 1981 hearing, the district court in February 1982 denied all intervention.[20] It ruled, *inter alia*, that the contract was not a third-party beneficiary contract under Louisiana law, that "none of the applicants for intervention ... have a direct, legally protected interest in this contract action between the two parties to the contract," and that the applicants had not overcome the presumption of adequate representation by NOPSI. This appeal by the applicants for intervention followed.

**Previous Consideration by This Court**

On original submission, a panel of this court held that the rate payers were not entitled to intervene as of right and that the district court did not abuse its discretion in denying them permissive intervention. 690 F.2d 1203. However, the panel further held that the individuals who were City officials (Mayor Morial and the Council members) were entitled to intervene as of right, because of the City's assumed status as NOPSI's rate regulatory authority, and also that the district court abused its discretion in denying them permissive intervention. *Id.* On rehearing, the panel, in December 1982, due to the information that all the City's relevant regulatory authority over NOPSI had been transferred to the Louisiana Public Service Commission (*see* note 19, *supra*), partially granted United's motion for rehearing and unanimously held that the City officials were not entitled to intervene as of right, but, one judge dissenting, adhered to its previous holding that they were entitled to permissive intervention. 694 F.2d 421. At the same time, intervenors' petitions for panel and for en banc rehearing were wholly denied. *Id.* United then filed a second petition for en banc rehearing, directed to the panel's opinion on rehearing, but no such petition was filed by intervenors. Thereafter, this court ordered the case reheard en banc, *id.* at 422, but in June 1983 that order was withdrawn when four judges recused themselves because of their status as NOPSI rate payers. 707 F.2d 834. Advice having been received from the Advisory Committee on Codes of Conduct of the Judicial Conference of the United States that recusal was unnecessary in that, *inter alia*, "the matter to be reheard en banc involves only the right of the mayor and city council to intervene" and there had been no ruling respecting rate payer class certification or representation, the judges concerned withdrew their disqualifications and the order directing the case to be reheard en banc was reinstated. 719 F.2d 733.

We accordingly determine that the questions principally before us are those per-

**20.** NOPSI made neither formal consent nor opposition to the attempted intervention, and did not seek to appeal either the magistrate's order or that of the district court. At the December hearing, NOPSI did not oppose the intervention, stated "we welcome" the intervenors into the litigation, and advised the court that NOPSI intended to prosecute its suit against United and that "if we make any recovery at all, then the amount of recovery will be credited or refunded to the rate payer." When specifically ques-

tioned by the district court in the latter connection, NOPSI reiterated its position and advised that its recovery would be "subject to the jurisdiction of the City Council, they will direct whether it will be credited or refunded." Although the district court did not rule at that time, it expressed its concern that if intervention were allowed, "you are going to complicate litigation" and "you are going to have the most gosh awful jumbled mess you ever saw in this thing."

taining to the entitlement of the City officials to intervene.

## DISCUSSION

### Intervention of Right

■ Respecting intervention under Rule 24(a)(2), Fed.R.Civ.P.,[21] we adhere to the statement in *International Tank Terminals, Ltd. v. M/V Acadia Forest*, 579 F.2d 964, 967 (5th Cir.1978):

"It is well-settled that to intervene as of right each of the four requirements of the rule must be met: (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit."

### Interest of Applicant

Here our focus is on the second requirement, that the applicant for intervention have an interest relating to the transaction which forms the subject matter of the action. What *kind* of interest is required? We have recognized that the 1966 amendments to Rule 24(a) eliminated the former general requirement that the applicant be legally bound by the result of the action, substituting the more flexible and practical criteria of the third requirement in the rule's current version. Otherwise, however, the *kind* of interest necessary was not affected. *See Diaz v. Southern Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir.), *cert. denied sub nom., Trefina A.G. v. United States*, 400 U.S. 878, 91 S.Ct. 118,

27 L.Ed.2d 115 (1970); *Hobson v. Hansen*, 44 F.R.D. 18, 24 (D.D.C.1968) ("while one's interest need no longer be decisively affected before intervention will be allowed, there is nothing in the new rule or in its attendant commentary to indicate that it effected a change in the kind of interest required").[22] Nor is it necessary that "the interest has to be of a legal nature identical to that of the claims asserted in the main action." *Diaz* at 1124. Nevertheless, as we stated in *Diaz*, "intervention [of right] still requires a 'direct, substantial, legally protectable interest in the proceedings'." *Id.* (quoting *Hobson*). Although we have described it as "a somewhat narrow reading' of the term 'interest'," *United States v. Perry County Board of Education*, 567 F.2d 277, 279 (5th Cir.1978), we have never departed from, and have in several cases reiterated, the "direct, substantial, legally protectable" definition of the required interest. *Id.* *See Piambino v. Bailey*, 610 F.2d 1306, 1321 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); *Howse v. S/V "Canada Goose I,"* 641 F.2d 317, 320–21 (5th Cir.1981). Several other circuits likewise employ this definition of the interest required. *See Westlands Water Dist. v. United States*, 700 F.2d 561, 563 (9th Cir.1983) ("... this interest is not a legally protectable interest that can support EDF's intervention as a party in a suit involving rights under contracts to which it is not a party."); *Dilks v. Aloha Airlines, Inc.*, 642 F.2d 1155, 1157 (9th Cir.1981) (per curiam) ("direct, non-contingent, substantial and legally protectable" interest); *Heyman v. Exchange National Bank of Chicago*, 615 F.2d 1190, 1193 (7th Cir.1980) (" 'direct, substantial, [and] legally protectable' " interest); *Wade v. Gold-*

---

**21.** Rule 24(a) provides:
"(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede

his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."
It is undisputed that clause (1) is wholly inapplicable here.

**22.** *See also* 3B Moore's Federal Practice ¶ 24.-07[2] (1982) ("The liberalization of Rule 24(a) was not aimed at revising the nature of the applicant's interest ...").

*schmidt*, 673 F.2d 182, 185 (7th Cir.1982) ("a direct, significant legally protectable interest"); *Athens Lumber Co., Inc. v. Federal Election Comm'n*, 690 F.2d 1364, 1366 (11th Cir.1982) (" 'direct, substantial, legally protectable interest' "). The Supreme Court in *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971), stated that the applicant's interest had to be "a significantly protectable interest." It is apparent that the Supreme Court in *Donaldson* used "protectable" in the sense of legally protectable, and it is difficult to conceive of any other sense in which the Court might have been employing "protectable" in that context.

■■■ By requiring that the applicant's interest be not only "direct" and "substantial," but also "legally protectable," it is plain that something more than an economic interest is necessary. What is required is that the interest be one which the *substantive* law recognizes as belonging to or being owned by the applicant. This is reflected by the requirement that the claim the applicant seeks intervention in order to assert be a claim as to which the applicant is the real party in interest. The real party in interest requirement of Rule 17(a), Fed. R.Civ.P., "applies to intervenors as well as plaintiffs," as does also the rule that "a party has no standing to assert a right if it is not his own." *United States v. 936.71 Acres of Land*, 418 F.2d 551, 556 (5th Cir. 1969).[23] *Accord Piambino*, 610 F.2d at 1321. As we stated in *United States v. 936.71 Acres of Land:*

"... it is elementary that,

" 'The "real party in interest" is the party who, by substantive law, possesses the right sought to be enforced, and not

necessarily the person who will ultimately benefit from the recovery.' Barron and Holtzoff, Federal Practice and Procedure, § 482 (Wright ed. 1961)." 418 F.2d at 556.[24]

*See also In re Penn Central Commercial Paper Litigation*, 62 F.R.D. 341, 346 (S.D. N.Y.1974), *aff'd without op.*, 515 F.2d 505 (2d Cir.1975) ("... an interest, to satisfy the requirements of Rule 24(a)(2) ... must be based on a right which belongs to the proposed intervenor rather than to an existing party ..."). *Cf. Heyman v. Exchange National Bank of Chicago*, 615 F.2d 1190, 1193 (7th Cir.1980) (intervention requires " 'a right to maintain a claim for the relief sought' ").

Analogously, intervention has been held subject to the prudential standing requirement that "the presence of harm to a party does not permit him to assert the rights of third parties in order to obtain redress for himself." *DuPree v. United States*, 559 F.2d 1151, 1153 (9th Cir.1977). For this proposition, *DuPree* cites *Warth v. Seldin*, 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975), where the Supreme Court applied "the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *See also id.* at 499, 95 S.Ct. at 2205; *Valley Forge College v. Americans United*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982).

In public law cases where statutory or constitutional violations are asserted as a basis for recovery, it has been said that standing is present when the complainant suffers injury and "the interest sought to be protected by the complainant is argu-

---

**23.** *See also* Wright & Miller, *Federal Practice and Procedure: Civil* § 1543 at 646 ("... the real party in interest requirement ... must be satisfied for purposes of asserting ... a claim by an intervenor"); 3A Moore's Federal Practice ¶ 17.07 at 17–77 (1982) ("Rule 17(a) applies to ... intervenors ..." (footnote omitted)).

**24.** *Accord* Wright & Miller, *Federal Practice and Procedure: Civil* § 1542 at 639 ("... the real party in interest principle is a means to identify the person who possesses the right sought to be

enforced"); *id.* § 1543 at 644 ("... the action will not necessarily be brought in the name of the person who will ultimately benefit from the recovery"). *See also* 3A Moore's Federal Practice ¶ 17.07 at 17–65 (1982) ("... the true meaning of real party in interest may be summarized as follows: *An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced.*" (footnote omitted)).

ably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). As a recognized text has observed, this zone of interest standing test in public law cases "is somewhat analogous to the Rule 17(a) standard that the party possess a substantive right under the applicable law...." Wright & Miller, *Federal Practice and Procedure: Civil* § 1542 at 642. In a sense, a party within the zone of interests protected by a statute may possess a type of substantive right not to have the statute violated.

Appellants, relying on *Trbovich v. United Mine Workers of America,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), urge that the foregoing principles are inapplicable to intervention under Rule 24(a)(2), because *Trbovich* authorized intervention under circumstances where the intervenor could not have initiated the suit. *Trbovich* involved an action brought by the Secretary of Labor against a union under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") to set aside an election of union officers on the ground that the election was held in a manner that violated the LMRDA. The suit arose from a complaint made by union member Trbovich to the Secretary, the LMRDA authorizing such complaints, after exhaustion of internal union remedies, and requiring the Secretary to investigate and, if finding probable cause to believe an LMRDA violation had occurred, to bring suit to set the election aside. The Supreme Court held that Trbovich was entitled to intervene in the Secretary's suit, for limited purposes, despite the fact that he could not have brought such a suit himself because the LMRDA provided that with respect to elections already conducted the "remedy" set out in the LMRDA was exclusive.

*Trbovich,* however, cannot be read to allow Rule 24(a)(2) intervention for the purpose of asserting the substantive rights of others, or as recognizing for that purpose an interest based on a substantive right not belonging to the intervenor. The *substantive* rights being litigated in *Trbovich* were the rights to have the union's elections conducted in conformity with the LMRDA. Clearly, the interest of members, such as Trbovich, in having their union's elections so conducted was within the zone of interests protected by the LMRDA's substantive provisions regulating such elections. Indeed, the *Trbovich* Court expressly stated that the LMRDA "gives the individual union members certain rights against their union" and that "those rights," along with public rights, were being enforced in the Secretary's action. *Id.* at 538–39, 92 S.Ct. at 636–37. Only the procedural "remedy," not the substantive right, was curtailed by the exclusivity provision of the LMRDA. The Supreme Court refused to give a broad reading to that provision, limiting it to the initiation of suit and the specification of claimed LMRDA violations.[25]

 It is, of course, often a difficult matter to determine the zone of interests protected or regulated by a constitutional provision or statute of general application. But the case before us does not involve such a public law question. Here the suit is on the contract between NOPSI and United and the dispute concerns the contract price for the Power Plant Gas. Relief is not sought by the City officials (or NOPSI) against United on the basis of the Natural Gas Act [26] or any asserted power to

---

**25.** The distinction, implicit in *Trbovich,* between the ability to invoke a procedural remedy and the possession of a substantive right is somewhat analogous to the distinction between the concepts of real party in interest and capacity. *See* Wright & Miller, *Federal Practice and Procedure: Civil* § 1542 at 639:

"... the real party in interest principle is a means to identify the person who possesses the right sought to be enforced.... By way

of contrast, capacity is conceived to be a party's personal right to litigate in a federal court.... Thus it is possible for a person to be the real party in interest and yet lack capacity to sue ...."

**26.** Moreover, the Natural Gas Act does not regulate the price of Power Plant Gas, and, while it prohibits abandonment of certificated deliveries, abandonment is not claimed here. *See* note 3, *supra. See also Pennzoil Co. v. Federal Energy*

regulate or approve NOPSI's purchase of or contracts for Power Plant Gas (or United's sale or contracts for sale of such gas).[27] Recovery is not sought from·United on the basis that the price it charged was one to which United and NOPSI could not have lawfully agreed or resulted from violation of positive law.[28] Rather, NOPSI and the City officials, whose sole allegation of substantive grounds of entitlement to relief is their adoption of NOPSI's complaint, seek recovery from United on the basis that United has charged NOPSI more than NOPSI has validly agreed to pay and that United is bound to the price specified in paragraph 4A1 of the 1975 agreement, as modified by the August and November 1978 agreements. Other than the City's now lapsed regulatory role and the claim of third-party beneficiary rights under the NOPSI-United contract, the *only* "interest" asserted as a basis for intervention is a

purely economic interest.· We hold that an economic interest alone is insufficient, as a legally protectable interest is required for intervention under Rule 24(a)(2), and such intervention is improper where the intervenor does not itself possess the only substantive legal right it seeks to assert in the action. Accordingly, we turn to the third-party beneficiary question.

### Third-Party Beneficiary Contract

■ Louisiana law, as all concede, governs the question of who possesses substantive legal rights under the NOPSI-United contract.[29] Generally speaking, only the parties to a contract, those holding under them (*e.g.*, by succession, assignment or subrogation, none of which are claimed here), and third-party beneficiaries (and those holding under them) have substantive rights under private contracts.[30] Here, the

*Regulatory Com'n,* 645 F.2d 360, 387 (5th Cir. 1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982) ("... the appropriate contract law to apply is the law that would govern the parties' dealings were there no regulation at all of the contract's subject matter"); *Cities Service Gas Company v. United States,* 500 F.2d 448, 205 Ct.Cl. 16 (1974). And, it has been held there is no private cause of action under the Natural Gas Act. *See Pennzoil Co.,* 645 F.2d at 384 n. 49; *Clark v. Gulf Oil Corp.,* 570 F.2d 1138 (3d Cir.1977), *cert. denied,* 435 U.S. 970, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978).

27. As previously observed, *see* note 3, *supra,* Louisiana does not regulate pipeline sales of Power Plant Gas. LSA–R.S. 45:1163. Although NOPSI's electricity business is subject to rate and other general governmental regulatory authority, and the application for intervention alleged the City's regulatory authority over NOPSI's electric rates, by the time the district court acted on the intervention all such authority had been transferred from the City to the Louisiana Public Service Commission. *See* note 19, *supra.*

28. This case is thus properly distinguished from *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), in which the State of California was permitted to intervene as of right in an antitrust action involving a gas supplier to that state. It has been held that a state has substantive rights to be free of antitrust injury to its general economy. *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). We also observe that *Cascade* predates *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534,

542, 27 L.Ed.2d 580 (1971), in which, as discussed in the text, *supra,* the Court held that intervention under Rule 24(a)(2) required a "significantly protectable" interest. Of course, in the present case various Louisiana Civil Code provisions are involved (*see* note 15, *supra* ), but only in the sense that they provide the overall legal framework governing what is essential to any binding contract and how such contracts are interpreted and enforced generally; they do not purport to positively prohibit or make affirmatively illegal any agreement or attempted agreement. It is plain that these articles do not create substantive rights or zones of interest beyond the parties to the purported agreement or those who would possess rights under the agreement were it enforceable.

29. However, as this is a suit in federal court, federal law governs the requirements for intervention, standing and real party in interest status, including the character of interest which is necessary for such purposes. *See* Wright & Miller, *Federal Practice and Procedure: Civil* §§ 1544, 1905; 3A Moore's Federal Practice ¶ 17.07 at 17–73 (1982); *Piambino,* 610 F.2d at 1321.

30. *See Logan v. Hollier,* 424 So.2d 1279, 1281–82 (La.App.1982) (quoting with approval from *Crowley v. Hermitage Health and Life Ins. Co.,* 391 So.2d 53, 55 (La.App.1980)):

"'The general rule is that parties to a contract may stipulate only for themselves. As a result, a third person not a party to a contract lacks the relationship necessary to sue for recovery of any of the contractual benefits.

only basis on which it is claimed that anyone other than NOPSI and United has substantive rights under the contract is the assertion that it is a third-party beneficiary contract, a *stipulation pour autrui* under Louisiana law.[31] The panel held that the NOPSI-United contract was not a *stipulation pour autrui*. We agree, for the reasons stated by the panel and others to be noted.

 Louisiana law is settled that for there to be a *stipulation pour autrui* there must be not only a third-party advantage, but "the benefit derived from the contract by the third party may not merely be incidental to the contract." *HMC Management Corp. v. New Orleans Basketball Club*, 375 So.2d 700, 708 (La.App.1979), *writs denied*, 378 So.2d 1384 (La.1980); *Logan v. Hollier*, 699 F.2d 758, 759 (5th Cir. 1983) (per curiam); *English v. National Collegiate Athletic Ass'n*, 439 So.2d 1218, 1223 (La.App.), *writs denied*, 441 So.2d 747 (La.1983); *Crowley v. Hermitage Health and Life Ins. Co.*, 391 So.2d 53, 55 (La.App. 1980); *Logan v. Hollier*, 424 So.2d 1279, 1282 (La.App.1982). Rather, the third-party benefit must form "the condition or consideration" of the contract in order for it to be a *stipulation pour autrui*. *City of Shreveport v. Gulf Oil Corp.*, 431 F.Supp. 1, 4 (W.D.La.1975), *aff'd*, 551 F.2d 93 (5th Cir.1977) (per curiam) ("Affirmed on the basis of the District Court's opinion ..."); *HMC Management*, 375 So.2d at 708; *Logan v. Hollier*, 699 F.2d 758, 759 (5th Cir. 1983) (per curiam). Moreover, a *stipulation pour autrui* will be found "only when the contract *clearly* contemplates the benefit to the third person as its 'condition or consideration'." *City of Shreveport*, 431 F.Supp. at 4 (emphasis added); *C.H. Leavell & Co. v. Glantz Contracting Corporation of Louisiana, Inc.*, 322 F.Supp. 779, 783 (E.D.La.1971). *See also Fontenot v. Marquette Casualty Co.*, 258 La. 671, 247 So.2d 572, 579 (1971) ("In Louisiana contracts for the benefit of others ... must be in writing and clearly express that intent."); *Logan v. Hollier*, 699 F.2d 758, 759 (5th Cir.1983) (per curiam) (same); *Crowley*, 391 So.2d at 55 (the agreement must "clearly express the intent to benefit another"); *Logan v. Hollier*, 424 So.2d 1279, 1282 (La.App.1982) (same); *Hertz Equipment Rental Corp. v. Homer Knost Construction Company, Inc.*, 273 So.2d 685, 688 (La.App.1973) (agreement must "clearly manifest an intention to confer a benefit upon a third party"); *HMC Management*, 375 So.2d at 708 (same).

There may be some uncertainty whether the required clear intent must be reflected by express provisions or may arise by implication. The language in *Fontenot* and some of the other cases above-cited indicates that an express provision is required. On the other hand, in *Allen & Curry Mfg. Co., Ltd. v. Shreveport Waterworks Co.*, 113 La. 1091, 37 So. 980 (1905), the Louisiana Supreme Court remarked, "We do not agree entirely with" the view of "counsel for defendant ... that there cannot be a stipulation pour autrui in the absence of express words to that effect," and went on to state that "the intention of the parties" controlled in this respect and "must be gathered ... from reading the contract, as a whole, in the light of the circumstances under which it was entered into." *Id.* 37

---

Nevertheless, there is an exception recognizing that contracting parties may agree between themselves that a third person not a party to their contract may derive benefit from it. This is the stipulation pour autrui and it allows the third party, for whose benefit the advantage is stipulated, an action to enforce the stipulation.'" (Footnotes omitted.)

*See also* LSA–C.C. art. 1901 (contracts "have the effect of laws *on those who have made them*" (emphasis added)).

**31.** *See* LSA–C.C.:

"Art. 1890. A person may also, in his own name, make some advantage for a third person the condition or consideration of a commutative contract, or onerous donation; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract can not be revoked.

" . . . .

"Art. 1902. But a contract, in which anything is stipulated for the benefit of a third person, who has signified his assent to accept it, can not be revoked as to the advantage stipulated in his favor without his consent."

So. at 984. However, the Court then observed:

"But inasmuch as people usually stipulate for themselves, and not for third persons, a strong presumption obtains in any given case that such was their intention; and we do not [32] agree with counsel for defendant to this extent—that the implication to overcome that presumption must be so strong as to amount practically to an express declaration.

" . . . .

"As furnishing instances where the implication was very strong, yet not strong enough to induce the courts to recognize a stipulation pour autrui, the following cases may be cited: . . . . " *Id.*

And, later in the opinion the Court, discussing certain decisions finding third-party beneficiary status, criticized them in part because they "impose by implication a liability which, if intended by the parties to be a part of their contract, would most indubitably have been made the subject of an express clause." *Id.* at 988.

Whether the requirement be for an express declaration or an extremely strong implication, it is evident that the NOPSI-United contract cannot be said to clearly contemplate the conferring of a benefit on third persons as its condition or consideration. Not only is there no indication of such intention,[33] but, as the panel stated, "[t]here is every indication that NOPSI entered into its agreements with United in the ordinary course of its business, not with the express intention of conferring a pecuniary benefit upon the customers." 690 F.2d at 1211.

We also observe that under the contract United is obligated to deliver gas only to NOPSI, and is neither obligated nor authorized to deliver to any third party. Like-

wise, United is neither obligated nor authorized to deliver at times or in quantities not specified by NOPSI. Nor are United's obligations to any extent conditioned on the joinder of any third party with NOPSI respecting requests for gas or other matters (except that FERC consent is required for abandonment). Only NOPSI is obligated to United for payment. On the other hand, full performance by United does not to any extent discharge any third-party legal obligations of NOPSI. Though NOPSI has legal obligations to third parties respecting the sale and delivery of electricity, none of such legal obligations is even partially discharged or reduced by United's fulfillment of its contractual obligations (the delivery of gas to NOPSI at the agreed price and at the times and in the quantities requested by NOPSI). NOPSI is not even legally obligated to itself generate the electricity it is required to sell, and while as a practical matter doubtless virtually all is generated by NOPSI, by no means is all so generated by plants using gas purchased from United as boiler fuel. The contract does not require NOPSI to purchase a specified quantity of gas from United, nor to use all gas available from United before using other sources of boiler fuel.

Where the promisor's performance is to be made to, and is subject to the control of, the promisee, the Louisiana courts have refused to find a *stipulation pour autrui* despite the fact that the promisor and promisee may have contemplated that the promisor's performance would as a practical matter enable or facilitate the promisee's performance of its obligations to a third party. *See Fontenot v. Marquette Casualty Co.*, 258 La. 671, 247 So.2d 572, 579 (1971) (reinsurance contract); *Oswalt v. Irby Const. Co.*, 424 So.2d 348, 354 (La.

---

**32.** The "not" at this place in the quoted language is obviously a printer's error. Clearly, the Court was agreeing with the proposition stated.

**33.** The reference in the initial "whereas" clause of the 1952 contract to NOPSI's desire to purchase gas for resale to its customers in New Orleans, *see* note 2, *supra*, provides no such indication. In the first place, this language refers only to Resale Gas, not to the Power Plant Gas at issue here, concerning which the clause

makes no reference to NOPSI's customers. Moreover, the obvious purpose of the clause was merely to distinguish between the two types of gas for regulatory purposes. Nor do we believe that a contract recital merely reflecting a purchaser's intention to resell the purchased product reflects an intention that benefit to the purchaser's customers be a condition or consideration of the contract. Finally, the 1952 contract has clearly long since expired.

App.1982) (agreement of grantee in right-of-way deed, where grantor reserved right to grow crops in right-of-way, to pay grantor for any future damage to crops on submittal of bill by grantor, was not *stipulation pour autrui* in favor of grantor's lessee; distinguishing cases in which promisor's agreement to pay is not stated in terms of payment to promisee of claims submitted by promisee); *Crowley v. Hermitage Health and Life Ins. Co.*, 391 So.2d 53 (La.App.1980) (health and accident insurance policy in which employer is insured, providing for benefits in the event of employee work-related injury to be paid to employer or persons furnishing services to employee, is not *stipulation pour autrui* in favor of employee injured on job). Even when the payments may be directly to the third party, but require the claim of the promisee, a *stipulation pour autrui* has not been found. *Logan v. Hollier* 424 So.2d 1279, 1282 (La.App.1982); *Logan v. Hollier*, 699 F.2d 758, 759 (5th Cir.1983) (per curiam).

The Louisiana approach appears to be consistent with the general common law rule in this regard, which would plainly consider the NOPSI-United agreement not to be a third-party beneficiary contract.[34]

■ Finally, we note that under Louisiana law a *stipulation pour autrui* cannot be altered to the disadvantage of the third-party beneficiary without his consent. *See* note 31, *supra.* The price of Power Plant Gas sold under the 1952 agreement was increased on at least two occasions (in 1965 and 1975), and the 1975 agreement maximum price was increased in August 1978 and again in November 1978, all apparently without any third-party permission. We think it highly unlikely that either NOPSI or United would have intended to disable themselves from amending such vital provisions of their contract without the consent of third parties. The City of New Orleans had no such regulatory power, nor did any other public body. Had the parties intended to confer such a benefit on the City or its officials such "would most indubitably have been made the subject of an express clause." *Cf. Allen & Currey Mfg. Co. v. Shreveport Waterworks Co.*, 113 La. 1091, 37 So. 980, 988 (1905).

■ For the foregoing reasons, we hold that the NOPSI-United agreement is not a *stipulation pour autrui*, and that accordingly the City officials are not third-party beneficiaries.

### Conclusion, Intervention of Right

■ As the NOPSI-United contract is not a *stipulation pour autrui* and as the

---

**34.** *See* 4 Corbin on Contracts § 779D at 45–46 (1951):

"... in any case where A is under a contractual duty to C the performance of which requires labor or materials, and B promises A to supply to him such labor or material; C has no action against B on this promise. In such cases the performance promised by B does not in itself discharge A's duty to C or in any other way affect the legal relations of C. It may, indeed, tend toward C's getting what A owes him, since it supplies A with the money or material that will enable A to perform, but such a result requires the intervening voluntary action of A. B's performance may take place in full without C's ever getting any performance by A or receiving any benefit whatever. In such cases, therefore, C is called an 'incidental' beneficiary and is held to have no right. It would be possible for A to make his contract with B in such terms as to show that A was making it for C's benefit and intended C to have an enforceable right. C would be a donee of the right though not of the promised performance. But in fact such contracts are never so worded." (Footnotes omitted.)

Louisiana appears to follow this rule. *See Police Jury v. Alexandria Gravel Co.*, 146 La. 1, 83 So. 316, 317 (1919). *See also Allen & Currey Mfg. Co. v. Shreveport Waterworks Co.*, 113 La. 1091, 37 So. 980, 986 (1905):

"The materials and labor contracted for by the builder who is constructing a house for me under contract are intended to be used on my house for my benefit, but the contracts for this labor and these materials are not for that reason my contracts, and I have not an action thereon."

The minority common law view to the contrary, *see CF Industries v. Transcontinental Gas Pipe Line Corp.*, 448 F.Supp. 475, 481–82 (W.D. N.C.1978) (applying North Carolina law and relying on *Gorrell v. Greensboro Water Supply Co.*, 124 N.C. 328, 32 S.E. 720 (1899)), appears to have been specifically rejected by the Louisiana Supreme Court in *Allen & Currey Mfg. Co.*, 37 So. at 988 (rejecting *Gorrell* and related cases).

City officials assert no other basis for a legally protectable interest or for possession of the substantive legal right—enforcement of the contract—which they seek to assert by intervention, their entitlement to intervene under Rule 24(a)(2) rests only on an economic interest. As we have noted, this alone is not sufficient.

The City and its officials *do* have an economic interest in, for example, a holding that the escalation clause in the contract is too indefinite and that NOPSI did not validly agree to United's May 3 price increase. Though the City (and, later, the Public Service Commission) was not legally required to automatically allow NOPSI to currently pass through its thus increased costs (*see* note 19, *supra*), had NOPSI been unable to recover these costs through higher rates its financial position might in time have become so impaired as to increase its cost of capital or force it out of business, with higher electric rates or other equally severe economic harm to the City being the ultimate result in any event. This consideration was noted by the panel. 690 F.2d at 1208–09. However, such economic harm is not materially different than that which would have ensued if, for example, the May 3 price had been specified in the November 1978 agreement, as NOPSI and United clearly had the right to do without City approval. The risk of economic harm to the City essentially arises from the regulatory "gap" which generally leaves NOPSI free to contract as it wishes for its boiler fuel, subject only to the constraints of regulation over other aspects of its business,

principally its electric rates. This leaves the City at risk of NOPSI's paying or agreeing to pay "too much" for boiler fuel. The *reason* that risk poses some economic danger is that utilities must generally either recover their costs (plus a profit) through their rates or eventually go out of business. Boiler fuel costs are not unique in this respect. Power plant and line construction and repair costs must equally be thus recovered, as well as other costs, including those arising from liability to third parties for personal injury or property damage in accidents, insurance costs and costs of raising capital. So long as the utility's operation of its business in these fields is not controlled by relevant regulation, the city which the utility serves is economically at some risk in respect to the utility's actions in these areas. But that fact does not entitle the city's officials to intervention under Rule 24(a)(2) in every personal injury, plant construction or maintenance contract or bond underwriting suit involving the utility and a third party, even though the increased costs which the utility has incurred, or will incur or fail to recoup if the litigation goes against it, have been or will necessarily ultimately be reflected in increased local utility rates.[35]

We accordingly hold that the City officials were properly denied intervention as of right because they lacked the character of interest required by Rule 24(a)(2).

### Permissive Intervention

■■■■■ The district court also denied the City officials permissive intervention under Rule 24(b)(2).[36] Permissive interven-

---

**35.** Of course, as we have observed, a different question might be presented if the third-party suit involved some public statutory prohibition of general application, such as, for example, violation of the antitrust laws, *cf. Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968) (suggesting that an overcharged buyer under "a pre-existing 'cost-plus' contract" might have an action against those who increased his seller's costs in violation of the antitrust laws), or of a statute which limited the charges that could be made to a utility for fuel or required their prior regulatory approval or the like. Naturally, we do not speak to such questions, the answers to

which would involve analysis of the particular statutory prohibitions in issue.

**36.** Rule 24(b) provides:
"(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued or

tion "is wholly discretionary with the [district] court ... even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied." Wright & Miller, *Federal Practice and Procedure: Civil* § 1913 at 551. Accordingly, when we are asked to review a denial of permissive intervention, the question on appeal is not whether "the factors which render permissive intervention appropriate under Federal Rule of Civil Procedure 24(b) were present," but is rather "whether the trial court committed a clear abuse of discretion in denying the motion." *Korioth v. Briscoe,* 523 F.2d 1271, 1278 (5th Cir.1975). *See also, e.g., Athens Lumber Co., Inc. v. Federal Election Comm'n,* 690 F.2d 1364, 1367 (11th Cir.1982) ("may be reviewed only for a clear abuse of discretion"); *United States Postal Service v. Brennan,* 579 F.2d 188, 192 (2d Cir.1978) ("the decision of the trial court may only be disturbed for clear abuse of discretion.... The trial court's discretion is very broad ..."); *May v. Commissioner of Internal Revenue,* 553 F.2d 1207, 1208 (9th Cir.1977) (per curiam) ("appealable only where there is a clear abuse of discretion").[37] We adhere to this standard of review, which is indeed most restrictive. Able counsel have called attention to no prior decision of this court reversing a denial of permissive intervention solely because

the district court abused its discretion. Indeed, such a decision by any federal appellate court is so unusual as to be almost unique.[38] We find no such extraordinary circumstances here as would justify our determining that the district court clearly abused its discretion.

In reversing the district court's denial of permissive intervention to the City officials, the panel on original submission stressed the City's rate regulatory authority over NOPSI (unaware of the transfer of that authority to the Public Service Commission), stating that "the government rate regulators will need to determine [presumably in NOPSI rate proceedings] the reasonableness of any recovery [by NOPSI] and the method of any refund to consumers"; that the "City Council's intervention ... merely accelerates the public sector review of claims that eventually will require public scrutiny in any event" and "will minimize any future protests that consumers otherwise might have against the City Council for failure to carry out its governmental regulatory responsibilities"; and, that permissive intervention should have been allowed "by the government authorities with rate regulatory responsibilities affecting both the underlying dispute and an existing party to the suit." 690 F.2d at 1210. Whatever the strength of

made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

It is undisputed that clause (1) is wholly inapplicable here. Likewise the second sentence of the rule is inapplicable, particularly after the transfer of regulatory jurisdiction to the Louisiana Public Service Commission.

37. The references to "clear" abuse stem from *Allen Calculators, Inc. v. National Cash Reg. Co.,* 322 U.S. 137, 142, 64 S.Ct. 905, 908, 88 L.Ed. 1188 (1944), where the Court stated concerning denial of permissive intervention, "[t]he exercise of discretion in a matter of this sort is not reviewable by an appellate court unless clear abuse is shown ...."

38. In *United States Postal Service v. Brennan,* 579 F.2d 188, 192 (2d Cir.1978), the second circuit remarked, "... we have not found a

single case in which a denial of permissive intervention under Rule 24(b) was reversed solely for an abuse of discretion. We see no reason to start with this case." In *Korioth v. Briscoe,* 523 F.2d 1271, 1278 n. 24 (5th Cir.1975), this court, in declining to reverse a denial of requested permissive intervention, quoted the following from Wright & Miller, *Federal Practice and Procedure: Civil* § 1923 at 631–32: "... there apparently is not a single case in which an appellate court has reversed solely because of an abuse of discretion in denying permissive intervention." However, the 1983 pocket part to the referenced text states (section 1923 at 413): "There now appears one case in which the appellate court has reversed solely because of an abuse of discretion in denying permissive intervention." The decision cited is *Crumble v. Blumthal,* 549 F.2d 462, 468–69 (7th Cir.1977). In *Crumble* the seventh circuit applied an "abuse of discretion" standard, but did not speak of "clear" abuse.

these considerations in the context of the assumptions on which they rested,[39] they are wholly inapplicable in view of the transfer of all the City's rate and other relevant regulatory authority to the Public Service Commission, which has not sought intervention.

■ In acting on a request for permissive intervention, it is proper to consider, among other things, "whether the intervenors' interests are adequately represented by other parties" and whether they "will significantly contribute to full development of the underlying factual issues in the suit." See *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326, 1329 (9th Cir.1977); *United States Postal Service v. Brennan*, 579 F.2d 188, 191–92 (2d Cir.1978).[40] See also *Hoots v. Commonwealth*, 672 F.2d 1133, 1136 (3d Cir.1982) (adequacy of representation).

■ In the present case, both the City officials and NOPSI seek exactly the same relief, on exactly the same grounds, from and as against United. There is neither indication nor assertion that NOPSI has been or will be in any way remiss or inadequate in pursuing these claims against United, or that there is any character of collusion between NOPSI and United.[41] Under these circumstances, NOPSI's representation is presumed to be adequate. *Ordnance Container Corp. v. Sperry Rand Corp.*, 478 F.2d 844, 845–46 (5th Cir. 1973); *International Tank Terminals, Ltd. v. M/V Acadia Forest*, 579 F.2d 964, 967–68 (5th Cir.1978); *Martin v. Kalvar Corp.*, 411 F.2d 552, 553 (5th Cir.1969). In *Commonwealth of Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214 (4th Cir. 1976), the court considered the application of the Commonwealth of Virginia to intervene as plaintiff in a suit by an electric utility serving the state against its supplier of nuclear fuel for breach of the supply contract. The fourth circuit held the denial of intervention was proper since there was no showing that the utility, which had the same ultimate objective as the state (enforcing the contract), was in collusion with its supplier or had inadequately pressed its suit. It was hence deemed an adequate representative.[42] *Commonwealth of Virginia* was cited with approval on that point by this court in *International Tank Terminals, Ltd.*, 579 F.2d at 967. The same result was reached in the analogous case of *Florida Power & Light Co. v. Belcher Oil Co.*, 82 F.R.D. 78, 81 (S.D.Fla.1979) (electric

**39.** In their respective submissions to the panel, neither United nor the applicants for intervention (who had not focused on the City's position) had made it apparent that the City's regulatory authority had been transferred to the Public Service Commission.

**40.** Other factors mentioned include the "nature and extent of intervenors' interest," *Spangler; Brennan,* and "their standing to raise relevant legal issues." *Spangler.* Here, though there is a real economic interest, the interest is not a legally protectable one, and the City officials do not have standing to raise relevant legal issues.

**41.** NOPSI has ample incentive to vigorously pursue this litigation. It has no assurance that, should it lose, it will be allowed to "pass through" the (or all of the) higher costs. *See South Cent. Bell Tel. v. Louisiana Pub. Serv. Comm'n,* 373 So.2d 478, 484 (La.1979) (recognizing "the Commission's authority to regulate the industry as an efficient enterprise, rather than as a luxurious one ..."); *Baton Rouge Water Works Co. v. Louisiana Pub. Serv. Comm'n,* 342 So.2d 609 (La.), *cert. denied,* 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 86 (1977) (broad discretion of Public Service Commission

in fixing rate of return); LSA–R.S. 45:1176 (Public Service Commission's power to "investigate the reasonableness and justness of all contracts, agreements and charges entered into or paid by" public utilities subject to its regulatory power to fix "just and reasonable rates"). Moreover, higher charges by NOPSI for electricity will tend to reduce NOPSI's electric sales (without increasing its unit margin, if the charges only relate to increased costs and include no profit or overhead element). These are exactly the same incentives as those which are deemed adequate to allow a utility to make its own decisions in such matters as purchasing fuel, plant construction and the like. There is no reason to suppose they are less adequate here.

**42.** Adequate representation was the only ground considered by the appellate court. Though the court was reviewing denial of intervention sought under Rule 24(a)(2), it did so under an abuse of discretion standard. *See* 542 F.2d at 216 ("The test on review is whether the district judge abused his discretion in denying the motion for intervention.").

utility customers denied intervention sought under Rules 24(a) and (b) in utility's suit against fuel oil supplier for overcharges; utility held to be adequate representative).

Moreover, the City officials advance no basis for or theory of recovery against United not advanced by NOPSI, and there is no suggestion that the City officials intend to make any contribution to development of the relevant facts in the suit which NOPSI will not make, or that the officials are in any respect in a better position to do so than NOPSI.

The effect on the existing parties is also to be considered. When the intervention is for all purposes with full party rights—and that is all that was sought below or has been urged on appeal—the control of the original parties over their own lawsuit is significantly diminished, at least where, as here, an essentially single, indivisible claim forms the only subject matter of the suit. *See* Wright & Miller, *Federal Practice and Procedure: Civil* § 1920 at 611 ("Unless conditions have been imposed, the intervenor is treated as if he were an original party and has equal standing with the original parties."). NOPSI and United clearly had the power to settle their differences without the permission of the City officials, if suit had not been filed. Yet, if the City officials are granted the intervention they seek they could prevent any settlement between NOPSI and United, or prevent those parties from simply accepting a judgment of the district court by allowing it to become final without appeal. Where the intervenors do not have a legally protectable interest, are adequately represented by an existing party and will not add to the relevant factual development of the case, the position of amicus may be considered more appropriate than an intervention with full-party status, if, as here, such intervention may materially diminish the original parties' rights. *Cf. Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir.1975); *Piedmont Paper Products v. American Financial Corp.*, 89 F.R.D. 41, 44–45 (S.D. Ohio 1980).

We are unable to find that the district court clearly abused its discretion in denying the City officials permissive intervention, and we accordingly dismiss the appeal in that respect. *Woolen v. Surtran Taxicabs, Inc.*, 684 F.2d 324 (5th Cir.1982).

## CONCLUSION

We hold that the City officials are not entitled to intervene as of right under Rule 24(a), and that the district court did not clearly abuse its discretion in denying them permissive intervention under Rule 24(b). As previously noted, the panel ruled that the rate payers were not entitled to intervention as of right and that the district court did not abuse its discretion in denying them permissive intervention. Those rulings as to the rate payers are correct, for under the circumstances here the legal principles set out in this en banc opinion respecting the City officials are also fully applicable to the rate payers, and we so hold. Accordingly, the district court's judgment is affirmed insofar as it denied intervention of right; in all other respects, the appeal is dismissed.

AFFIRMED IN PART; DISMISSED IN PART.

JERRE S. WILLIAMS, Circuit Judge, with whom GOLDBERG, ALVIN B. RUBIN, TATE and JOHNSON, Circuit Judges, join, dissenting:

This is not just a little breach of contract case between two corporations. This litigation will inescapably decide how much the citizens of the City of New Orleans will pay their enfranchised monopoly, New Orleans Public Service, Inc., for their electric power. Because the majority of the Court holds it is no abuse of discretion to deny the Mayor and City Council of New Orleans participation in this lawsuit although it is vital to the well being of the city's citizens, I find it necessary to dissent. The majority holding strikes a serious blow against the heralded modern development in law protecting the rights of consumers by allowing them to participate in administrative and judicial decisions for which they

ultimately pay the full price out of their own pockets.

The majority opinion presents the factual posture of this case with commendable thoroughness. Further, I am in full agreement of that carefully reasoned portion of the opinion which holds that the Mayor and City Council of New Orleans, are not entitled to intervention as a matter of right. When the city yielded its ratemaking functions to the state Public Utilities Commission, see opinion for the Court note 19, it yielded its claim to compulsory intervention in this case. The panel so held. 694 F.2d 421 (5th Cir.1982).

I accept the proposition set out in the opinion for the Court that it is unusual to upset a denial of permissive intervention by the district court. But that is no justification for abdicating the power of review we are charged to exercise. A denial of permissive intervention is subject to our review on the claim that the district court abused its discretion. Further, I concede that the standard to be applied is one of "clear abuse". *Allen Calculators, Inc. v. National Cash Register Co.*, 322 U.S. 137, 142, 64 S.Ct. 905, 908, 88 L.Ed. 1188 (1944); *Korioth v. Briscoe*, 523 F.2d 1271, 1278 (5th Cir.1975); *but c.f., Crumble v. Blumthal*, 549 F.2d 462, 468 (7th Cir.1977). If there is yet a dearth of decisional law on what constitutes a "clear abuse of discretion" as to an issue of permissive intervention, it is time that some be made. This is a superb case in which to do it.

In presenting this dissent, I rely largely upon the consideration of this issue found in the panel decision of the Court, *New Orleans Public Service, Inc. v. United Gas Pipe Line Co.*, 690 F.2d 1203, 1209 (1982). I add by way of emphasis only a brief analysis to reemphasize why the failure to allow the Mayor and the City Council to intervene was a clear abuse of discretion by the district court.

The controlling rule is Fed.R.Civ.P. 24(b). The negative aspect of the rule admonishes the Court in exercising its discretion to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." There is no showing in this case that allowing the Mayor and City Council to intervene would create substantial prejudice to the parties. The panel opinion recognized that creating a large class of consumers and allowing them to intervene would bring about a level of interference which would bring the stated negative concern clearly into play. And that is why the panel refused to find an abuse of discretion in the failure to certify a class of consumers.

Allowing the city through its governing body to intervene is a wholly different matter. The Mayor and City Council of New Orleans are the elected representatives of the people of New Orleans. They can properly serve as the representatives of the consumers in New Orleans without unduly complicating the judicial proceedings. The interests of the citizens of New Orleans in this case, acting through their elected representatives, should not be brushed aside. Only by ignoring the realities of the situation can inexorable and insensitive logic lead to the denial of intervention in this case.

We cannot close our eyes to the realities of the "pass-through", *c.f., Commonwealth of Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214, 216 (4th Cir.1976). With the development and common use of the ubiquitous pass-through, there simply can be no assurance that this public utility monopoly can be certain to represent the consumers to the full extent of their interest in this litigation. NOPSI knows it can fall back with confidence in any ratemaking proceeding before the Commission on a guarantee of "fair return." *Baton Rouge Water Works Co. v. La. PUC*, 342 So.2d 609 (La.Sup.Ct.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 86 (1977). The *issue* which NOPSI and New Orleans presents is the same, but the *interests* which NOPSI represents do not fully encompass the *interests* which should be represented by the Mayor and City Council on behalf of the electorate—the citizens who put them in office and who pay the electric bills.

In substantial measure, the majority of the Court unfortunately returns to the days before our recognition that the consumers, those who pay, must be allowed to participate in legal and administrative proceedings which have a potent impact upon them. Since the ground breaking decision in *Office of Communication of United Church of Christ v. Federal Communications Commission*, 359 F.2d 994 (D.C.Cir. 1966), in which Judge Burger (now Chief Justice Burger) insisted upon the right of consumers to participate in administrative proceedings which affect them, we have broadly recognized the rights of consumers to participate in administrative and judicial proceedings in which their fate is deeply involved. This is such a case.

By limiting the intervention to the Mayor and City Council of New Orleans, we would avoid the burdens which Rule 24(b) protects against. Yet no reason whatsoever is shown for denying consumers the right to be heard in this case through their elected representatives. There is no substantial burden, and there is every reason to recognize that the interests of the consumers move beyond the interests of their enfranchised power company. Finally, if United Gas Pipeline prevails in this litigation, NOPSI will not pay, but the consumers in New Orleans will pay. It is a clear abuse of discretion to forbid them participation in a case in which they have such an urgent interest.

No, this is not just a little breach of contract case between two corporations. The outcome of this litigation will fix the price NOPSI will pay for the gas used to generate electricity to be sold—under regulation but without the pressures of competition—to the citizens of New Orleans. It is lamentable to say that the citizens have so little interest in this litigation that they should not be permitted to participate as parties through their elected representatives. I dissent.